Piper v. SSA                           CV-96-243-SD 06/09/97

**UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW HAMPSHIRE**


Pamela J. Piper


    v.                                    Civil No. 96-243-SD

Shirley S. Chater, Commissioner,
 Social Security Administration


## O R D E R


    Pursuant to 42 U.S.C. § 405(g), plaintiff Pamela J. Piper

seeks review of a final decision of the Commissioner of the

Social Security Administration denying her claim for benefits.

Presently before the court is plaintiff's motion to reverse on

the ground that the Commissioner's decision was not supported by

substantial evidence in the record.  Defendant has moved to

affirm.  For the reasons that follow, the court affirms.


### Administrative Proceedings

    Plaintiff originally filed an application for a period of

disability and supplemental security income benefits with a

protective filing date of February 16, 1993, alleging an

inability to work because of incontinence and rectal pain since

December 27, 1991.  Transcript (Tr.) 78.  The Social Security

Administration denied the application on May 20, 1993, and denied

it again upon reconsideration on December 16, 1993.

Plaintiff filed the present application on March 25, 1994, again alleging that she had been disabled since December 27, 1991. Tr. 128. The application was denied initially on May 24, 1994, and on reconsideration on October 4, 1994. After Piper filed a timely request for a hearing, an Administrative Law Judge (ALJ) held a hearing on April 19, 1995, at which he heard testimony from the claimant, who was represented by counsel, and from a vocational expert. Finding that new and material evidence provided good cause, the ALJ reopened Piper's application of February 16, 1993, as well as all of the previous adverse determinations.

On August 4, 1995, the ALJ issued a written decision finding that (1) the claimant had not engaged in substantial gainful activity since December 27, 1991; (2) the claimant has severe rectal and bowel problems, depression, an eating disorder with resulting morbid obesity, and bladder incontinence, but does not have an impairment or combination of impairments listed in or medically equal to one listed in 20 C.F.R. § 404, App. 1, Subpt. P, Table No. 1; (3) the claimant's testimony was not consistent as to the disabling effect of her symptoms; (4) the claimant has the residual functional capacity to perform the exertional and nonexertional requirements of light work except that involving

repetitive bending and stooping, or prolonged sitting, standing, or walking; she requires a sit/stand option; she must have access to a bathroom at will; and her ability to cope with a high-stress work environment is moderately impaired; (5) the claimant is unable to perform her past work as a custodian; and (6), based on her exertional capacity for light work and her age, education, and work experience, Piper is not disabled. See 20 C.F.R. § 416.969; 20 C.F.R. § 404, App. 2, Subpt. P, Table No. 2.

The Appeals Council denied plaintiff's request for review on March 1, 1996, thereby rendering the ALJ's decision the final decision of the Commissioner and subject to judicial review.


## Medical History

The court here includes some of the highlights from the Joint Statement of Material Facts filed by the parties pursuant to Local Rule 9.1(b). The complete statement can be found at Appendix A.

Plaintiff, who was born on August 31, 1953, is a high school graduate and has past work experience as a medical receptionist, a custodian, and a senior companion. She claims she has been unable to work since December 27, 1991, due to rectal and bowel problems and urinary incontinence.

Plaintiff's medical history is marked by multiple medical

conditions and symptoms, including cervical cancer, obesity, depression, an eating disorder, an entercolonic fistula, a perirectal abscess, and narrowing of the anal sphincter. Prior to the alleged onset of her disability in 1991, she had intestinal bypass surgery in 1976, a cholecystectomy in 1977, and plastic surgery for panniculectomy, whereby the abdominal apron of superficial fat was excised.

In March 1991 she was diagnosed with cervical cancer by Dr. Jackson Beecham at Dartmouth Hitchcock Medical Center (DHMC) and in April had a radical hysterectomy and pelvic lymphadectomy. In June of that year she returned to DHMC complaining of diarrhea, leg swelling, abdominal swelling, and erythema. Another surgeon opened her abdominal wound and found it to extend below the fascia for at least 14 cm. An abdominal CT scan demonstrated a large fluid collection in the right pelvic gutter, anterior to the wound. The wound was found to be expelling brown stool and flatus. Plaintiff was treated with antibiotics and advised to maintain bowel rest.

Plaintiff returned to DHMC in September of 1991 on an emergency basis, complaining of exquisite constant perianal pain. Dr. Thomas Colacchio found her to be moderately obese, oriented, and well nourished. She seemed to be acutely uncomfortable sitting down, but otherwise was in no apparent distress. Later

4

that month she underwent repair of an anal fissure without complications. She was seen again in November, complaining of diarrhea and rectal pain. The record reflects no other hospital or medical reports until February 1993, at which time a cervical cytology test was performed, which came back as normal.

On March 21, 1993, Dr. Donald O. Lacey, a general practitioner who had treated plaintiff for 15 years, wrote the New Hampshire State Disability Determination Service (DDS) and stated that plaintiff continued to have significant pain and discomfort when sitting or squatting, as well as urinary incontinence. He opined that she was unable to work because of constant urinary leakage and trouble with bowel movements. He further stated that sitting and standing caused discomfort and embarrassment due to leakage.

On May 4, 1993, Dr. Maurice Kelley, Jr., of DHMC wrote the DDS that plaintiff's problems related to an inability to control her bowel and bladder functions. He opined that her intestinal bypass, extensive pelvic surgery, and further complications resulted in dysfunction of the rectum, bladder, and pelvic floor, leaving her unable to control her bladder and bowel functions. Plaintiff reported to him that she made frequent trips to the bathroom because of the urge to defecate or urinate. Dr. Kelley opined that plaintiff was precluded from doing any work involving

sitting, standing, walking, lifting, carrying, or bending.

On July 8, 1993, Dr. Lacey examined plaintiff as part of an application for state Medicaid assistance. He opined that plaintiff was unable to work since April 1991 but that she had the potential for gainful employment upon successful treatment of her urinary incontinence and bowel difficulties. He found no abdominal, genito-urinary, gynecological, or anorectal abnormalities. He further noted that plaintiff felt better since taking Prozac, an antidepressant medication.

In September of 1993 plaintiff again visited DHMC, complaining of painful bowel movements, chronic diarrhea, and depression. The doctor recommended some dietary changes.

On September 22 she was evaluated by psychiatrist Dr. Stephen Cole at the request of the state DDS. Dr. Cole opined, among other things, that she had a deficit in coping skills and had a tendency to rely on escapist coping mechanisms such as drugs and alcohol. He also stated it was unlikely that she would be able to cope with the normal pressures of the workplace until her medical and living situations stabilized.

On December 20, 1993, plaintiff underwent surgery at DHMC to reverse her intestinal bypass and to correct a cystocele (a protrusion of the urinary bladder through the vaginal wall). She tolerated the surgery well. As a follow-up to her surgery, she

6

was seen at DHMC on February 10, 1994, by Dr. Kenneth Burchard, who reported that plaintiff told him she was doing well since her surgery, "her only complaint being the sense that she needs to stimulate an evacuation once a day with a suppository." Tr. 298.

During the first few months of 1994, plaintiff received evaluations and treatment for ongoing depression. Dr. Lacey saw her in March when she asked him to fill out a Vermont Medicaid form. She reported she was doing well, except for frequent urination and incontinence, particularly during sexual activity. Tr. 283. On October 25, 1994, she saw Dr. Ann Gormley at DHMC, who diagnosed her with Type III stress urinary incontinence and recommended use of a rectofacial pubovaginal sling.

Discussion

A. Standard of Review

A federal district court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner of the Social Security Administration], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

A denial of social security disability benefits should be upheld unless "'the Commissioner has committed a legal or factual error in evaluating a particular claim.'" Manso-Pizarro v.

7

Secretary, 76 F.3d 15, 16 (1st Cir. 1996) (quoting Sullivan v. Hudson, 490 U.S. 877, 885 (1989)).

When reviewing a social security disability determination, the factual findings of the Commissioner "shall be conclusive if supported by 'substantial evidence.'" Irlanda Ortiz v. Secretary, 955 F.2d 765, 769 (1st Cir. 1991) (quoting 42 U.S.C. § 405(g)). "[S]ubstantial evidence" requires "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)); Rodriguez v. Secretary, 647 F.2d 218, 222 (1st Cir. 1981).

However, substantial evidence "is something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Federal Maritime Comm'n, 383 U.S. 607, 620 (1966) (citing NLRB v. Nevada Consol. Copper Corp., 316 U.S. 105, 106 (1942)). The decision of the Commissioner must be affirmed, "even if the record arguably could justify a different conclusion, so long as it is supported by substantial evidence." Rodriguez Pagan v. Secretary, 819 F.2d 1, 3 (1st Cir. 1987) (citing Lizotte v. Secretary, 654 F.2d 127, 128 (1st Cir.

8

1981)), cert. denied, 484 U.S. 1012 (1988).

It is incumbent on the Commissioner "to determine issues of credibility and to draw inferences from the record evidence." Irlanda Ortiz, supra, 955 F.2d at 769 (citing Rodriguez, supra, 647 F.2d at 222). Moreover, "the resolution of conflicts in the evidence is for the Commissioner, not the courts." Id.; Evangelista v. Secretary, 826 F.2d 136, 141 (1st Cir. 1987); see also Burgos Lopez v. Secretary, 747 F.2d 37, 40 (1st Cir. 1984); Sitar v. Schweiker, 671 F.2d 19, 22 (1st Cir. 1982).

Since determinations regarding factual issues and the credibility of witnesses are entrusted to the Commissioner, whose findings should be accorded great deference, see, e.g., Frustaglia v. Secretary, 829 F.2d 192, 195 (1st Cir. 1987), the court "'must uphold the [Commissioner's] findings . . . if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support his conclusion.'" Irlanda Ortiz, supra, 955 F.2d at 769 (quoting Rodriguez, supra, 647 F.2d at 222).

B.  The ALJ's Treatment of the Opinions of Plaintiff's Physicians

Plaintiff argues that the ALJ disregarded the opinions of three physicians, Drs. Lacey, Kelley, and Cole, concerning the issue of her ability to work, which thereby caused him to

undervalue the degree to which her ability to work was impaired by her urinary incontinence, bowel and rectal problems, and depression. Decisions as to whether a claimant's medical condition is "disabling," as that term is defined under the Social Security Act, is reserved to the ALJ, 20 C.F.R. § 404.1527(e)(1), and the ALJ may disregard opinions from a medical source that a claimant is "disabled" or "unable to work" when there is contradicting evidence from other medical sources. The ALJ concluded that the claimant's combination of impairments, including her bowel and rectal problems stemming from prior surgery, her urinary incontinence, and her depression amounted to a "severe" impairment under the Act. Tr. 14. However, although he accepted the objective findings and diagnoses of Drs. Lacey, Kelley, and Cole, the ALJ departed from some of the physicians' opinions as to the degree to which Piper's symptoms interfered with her ability to work.

In evaluating the intensity or persistence of Piper's symptoms and the extent to which they affected her ability to work, the ALJ carefully considered the available evidence, including the claimant's medical history and statements from the claimant and from her treating or examining physicians and/or psychologists. See 20 C.F.R. § 404.1529(c)(4). In addition, when he evaluated the degree of claimant's pain and other

10

subjective symptoms, the ALJ carefully applied the relevant factors in coming to this conclusion. See Avery v. Secretary, 797 F.2d 19, 23 (1st Cir. 1986). Considerations capable of substantiating subjective complaints of pain and other symptoms include evidence of daily activities; the nature of the pain and other symptoms; precipitating and aggravating factors; the type, dosage, effectiveness and side effects of any medication taken to alleviate the pain or other symptoms; other treatment received to relieve pain or other symptoms; and any other factors relating to claimant's functional limitations and restrictions due to pain. 20 C.F.R. § 404.1529(c)(3); Avery, supra, 797 F.2d at 23.

Dr. Lacey, Piper's treating physician, based his opinion that she was unable to work on Piper's

> significant problems regarding pain and discomfort on sitting or squatting as well as problems with urinary incontinence. She has virtually constant leakage of urine and continued trouble with bowel movements. For this reason she has found it extremely difficult to engage in any sort of work. Sitting and standing cause her discomfort as well as embarrassment due to her leakage.

Tr. 267. Similarly, Dr. Kelley described her symptoms as an "inability to control her bladder and bowel function" and opines that she is precluded from any work requiring sitting, standing, walking, lifting, carrying, and bending because of her disorder. Tr. 287.

The ALJ properly considered these opinions of disability in

11

the context in which they were made.  Significantly, they were made directly prior to Piper's surgery to reverse her intestinal bypass.  After her surgery, plaintiff's bowel dysfunction and pain substantially improved, although her incontinence worsened.  As Dr. Lacey's and Dr. Kelley's conclusions about disability were influenced by plaintiff's bowel dysfunction and pain, the ALJ was justified in factoring in plaintiff's successful treatment with surgery, which occurred subsequent to these physicians' reports.[1]

To the extent that Drs. Lacey and Kelley based their opinions on the plaintiff's frequent urination and leakage, the ALJ was justified in relying on other evidence, particularly plaintiff's own testimony.  The physicians' opinions on the frequency of plaintiff's urination and the extent of her leakage were based on her own reports.  Substantial evidence elsewhere in the record existed to support the ALJ's conclusion that plaintiff's urinary difficulties, although severe, would not compromise her ability to work, so long as she had access to a bathroom "at will."  Plaintiff's own testimony is particularly enlightening.  She testified that she uses the bathroom an average of 20 times per day, Tr. 46, and that she often leaks

_____

[1]Plaintiff did report diarrhea and rectal pain in November of 1991.  The ALJ apparently disregarded this as evidence that her condition was severe because she did not again report bowel troubles until March 21, 1993.

12

urine when she stands up but not when she has had access to a bathroom, Tr. 49. Despite her condition, she was able to work for Dr. Lacey as a medical receptionist over a six-month period in 1994, two days a week, four hours per day. Plaintiff testified that she never had to leave work because of wet clothing, although she did experience some wetting. Tr. 48. Her job ended, not because of her physical condition, but because she had a personal dispute with a patient. Tr. 54. She also testified that she could perform a job that required sitting so long as her need to use the bathroom was accommodated. Tr. 49. Finally, although plaintiff testified that her urinary difficulties increased following her December 1993 surgery, Tr. 45-46, Dr. Gormley, a treating physician at DHMC, wrote that plaintiff would benefit from using a rectofacial, pubovaginal sling.[2]

As for her depression and anxiety issues, plaintiff accuses

_____

[2]The ALJ also might have noted that while Drs. Lacey and Kelley relied on plaintiff's reports of urinary incontinence in 1993, plaintiff's testimony at the hearing almost minimizes her incontinence problems at that time:

> Q. . . . Did you have any problem with urinary incontinence prior to that operation where they reconnected your intestines in '93?
> A. I did but it wasn't, you know, nothing like it is now.

Tr. 45.

13

the ALJ of revisionism concerning the report of Dr. Cole, a psychologist who examined her in September of 1993 at the request of the New Hampshire Disability Determination Service. The court has carefully reviewed Dr. Cole's report and finds that the ALJ interpreted it fairly and, contrary to plaintiff's contentions, the ALJ did not substitute his own opinion for that of Dr. Cole on any medical issue.

Dr. Cole opined that "[a]t the present time it is unlikely that Ms. Piper would be able to cope with the normal pressures of the work place. If her medical and living situation can be stabilized, it is my opinion that she would be able to return to work." Tr. 294. When read in context of the rest of his rather detailed report, Dr. Cole's statement that Piper is unable to cope with work appears to be largely based on his belief that her physical and living situations were contributing to her mental condition and on his understanding that she was about to undergo surgery to reverse her previous intestinal bypass surgery. In her interview with Dr. Cole, Piper complained of pain in her rectum, daily diarrhea, sleep difficulties, depression, and anxiety, and also reported fears regarding her upcoming surgery. Tr. 289-90. Dr. Cole also noted that Piper had been coping with "severe medical problems over the past two to three years." Tr. 293. He writes at one point in his report, "While her dysthemia

14

clearly preceded her medical problems, it is likely that it has been maintained by her physical difficulties."  Tr. 294.[3]  As correctly noted by the ALJ, Piper testified that her bowel problems, one of the primary concerns she had raised with Dr. Cole, were relieved following the corrective surgery performed several months after Dr. Cole wrote his report, Tr. 49-50, although her urinary incontinence may have worsened following the surgery.  Given the overall improvement in her physical condition, it was reasonable for the ALJ to conclude after reading Dr. Cole's report that plaintiff's depression and anxiety, while severe, would only moderately impact her ability to cope with work.

In addition, substantial evidence existed to support that Piper's depression and anxiety did not have a significant impact on her ability to work.  She informed Dr. Cole that she had been taking Prozac for two to three months, which "has significantly reduced her depression and increased her ability to cope."  Tr. 290.  In addition, neither the depression nor her anxiety appeared to have significantly interfered with her ability to

---

[3]"Dysthymia" is defined as a "mood disorder characterized by depressed feeling . . . and loss of interest or pleasure in one's usual activities and in which the associated symptoms have persisted for more than two years but are not severe enough to meet the criteria for major depression."  DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 519 (28th ed. 1994).

15

work as a part-time receptionist for Dr. Lacey. Finally, even Dr. Cole concludes at one point that given the results of Piper's psychological testing she "is likely to have exaggerated the severity of her psychological symptoms." Tr. 293.

The court finds that the ALJ gave appropriate weight to the medical opinions of Piper's physicians and therefore Piper is not entitled to reversal or remand on this ground.

C. Assessment of Residual Functional Capacity/Hypothetical Posed to Vocational Expert

Plaintiff next argues that substantial evidence does not support the ALJ's conclusion that she had the residual functional capacity to perform a full range of light work. The ALJ's specific finding as to Piper's residual functional capacity was actually that her ability to perform light work had limitations.

> The claimant has the residual functional capacity to perform the physical exertion and nonexertional requirements of work except for medium and greater exertional work and light work involving repetitive bending and stooping, prolonged sitting, standing and walking. She requires a sit/stand option and must have access to use the bathroom at will. She would also need to avoid heights and moving machinery, as well as noise and vibration. She has a moderate decrease in her ability to cope with high stress work and would be restricted from detailed, complex work and tasks involving close supervision or a great deal of contact with co-workers.

Tr. 23. The ALJ dutifully included these limitations in the

16

hypothetical posed to the vocational expert, who stated that substantive numbers of jobs existed in the economy for a person with such limitations.

Piper contends, among other things, that her urinary incontinence precludes her from performing the exertional requirements of light work because she cannot stand for six hours at a time, cannot carry 20 pounds, and constantly needs to use the bathroom. The ALJ's finding as to Piper's residual functional capacity specifically accounts for the fact that Piper could not stand or sit for "prolonged periods of time," id., and also provides that Piper needs access to a bathroom at will. For the reasons outlined above, substantial evidence in the record, including plaintiff's own testimony, existed to support the ALJ's conclusion that Piper's incontinence would not significantly interrupt her ability to perform light work when she was given access to a bathroom at will.

As for the light work requirement that a claimant must be able to lift twenty pounds, 20 C.F.R. § 416.967(b), evidence from two consulting physicians indicated that Piper would be capable of such effort. In November of 1993 Homer E. Lorenco, M.D., reviewed the record and completed the Residual Physical Functional Capacity Assessment. Tr. 79-86. He determined that plaintiff could occasionally lift/carry up to twenty pounds and

17

frequently lift/carry up to ten pounds.  Similarly, Henry
Dantzig, M.D., reviewed the record in April 1994, four months
after Piper underwent reverse intestinal bypass surgery, and
found that she retained the functional capacity to perform light
work.  Tr. 133-40.  Although these were nonexamining physicians,
the ALJ is entitled to give their opinions some weight,
particularly that of Dr. Dantzig, as he mentioned many of
plaintiff's medical impairments and wrote more than a cursory
evaluation of her condition, indicating that he carefully
reviewed her medical history.  See, e.g., Berrios Lopez v.
Secretary of HHS, 951 F.2d 427, 431 (1st Cir. 1991); cf. Rose v.
Shalala, 34 F.3d 13, 19 (1st Cir. 1994) (cautioning that the
amount of weight accorded to nonexamining physicians varies with
the circumstances and that in some cases written reports
submitted by nonexamining physicians cannot constitute
substantial evidence).

Plaintiff also argues that the ALJ minimized her depression
and ignored the fact that she once had attempted suicide.  The
record reveals, however, that the ALJ considered both plaintiff's
depression and her suicide attempt in making his findings.  In
fact, he appears to have factored plaintiff's mental illness into
her residual functional capacity by concluding that plaintiff had
a moderate deficit in her ability to cope with high-stress work.

18

Tr. 23.

Finally, plaintiff takes issue with the hypothetical question posed by the ALJ to the vocational expert.  A hypothetical must be supported by substantial medical evidence and must clearly convey the parameters of the claimant's restrictions.  Keating v. Secretary, 848 F.2d 271, 274 (1st Cir. 1988); Arocho v. Secretary, 670 F.2d 374, 375-76 (1st Cir. 1982).

Plaintiff argues that the hypothetical was defective in that it failed to adequately reflect the number of times during an average work day she would need to use the bathroom.  The vocational expert's testimony regarding the bathroom-break issue can be boiled down to this:  Jobs exist that could accommodate a claimant's need to use a bathroom on an "at will" basis, so long as her use of the bathroom was not frequent or constant and did not exceed one time per hour.  Tr. 58-60.  For example, the vocational expert explained that if the claimant had to be away from her work area ten times in addition to lunch and other break times during an eight-hour day, that would compromise her ability to perform the available light and sedentary jobs in the national economy.  Tr. 57-59.

Substantial evidence existed to support the ALJ's apparent conclusion that plaintiff's need for bathroom breaks "at will"

was not so frequent or constant as to exceed one time per hour.[4]
Plaintiff's testimony at the hearing was that she needed to use
the bathroom twenty times per day. However, seemingly
contradictory evidence existed on the record, such as that
plaintiff is able to take daily walks for up to an hour and was
able to work as a receptionist for fours hours at a time without
significant interruptions for bathroom breaks. In addition, the
ALJ might have noted that despite many trips to physicians for
treatment of her incontinence, her chief medical complaint after
her 1993 surgery typically did not concern the frequency of her
need to urinate, but rather the leakage of urine during certain
physical activities, a condition that could be corrected by use
of a recto-facial pubovaginal sling. Accordingly, the ALJ's
decision to disregard Piper's testimony about using the bathroom
twenty times per day was supported by substantial evidence and
thus must be upheld, even if the evidence also could support a
different conclusion. The court therefore cannot find that
plaintiff is entitled to reversal or remand on the ground that
the ALJ's findings regarding her residual functional capacity
were not supported by substantial evidence.

---

[4]The court will confine its attention to plaintiff's
experience of incontinence following her December 1993 surgery
because at that point her incontinence worsened substantially.

20

## Conclusion

For the above-stated reasons, the court affirms the decision of the Commissioner. The clerk is instructed to close this case.

**SO ORDERED.**

_____
Shane Devine, Senior Judge
United States District Court

June 9, 1997

cc:  Jonathan P. Baird, Esq.
     David L. Broderick, Esq.

21